# CHARLESTON.

ARCHER v. BALTIMORE BUILDING & LOAN ASS'N *et al.*

Submitted Febuary 11, 1898—Decided April 20, 1898.

1. BUILDING AND LOAN ASS'N—*Foreign Building and Loan Ass'n—Domestic Building and Loan Ass'n.*

Foreign building associations legally doing business in this State have the same rights, powers, and privileges, and are subject to the same regulations, restrictions, and liabilities as domestic associations. (p. 40.)

2. BUILDING AND LOAN ASS'N —*Premiums on Loans.*

Building associations are authorized to adopt by-laws fixing a minimum premium at which to award loans to their members, such premiums to be deducted from the loans in advance or paid in periodical installments. (p. 41.)

3.  BUILDING AND LOAN ASS'N—*Usury—Constitutional Law*
        Section 26, chapter 54, Code, in so far as it exempts building
    associations from the operation of the general law in relation to
    usury, is not unconstitutional.  (p. 41.)

Appeal from Circuit Court, Wood County.

Bill by Elvira B. Archer against the Baltimore Building
& Loan Association and others.   From a decree for plain-
tiff, defendants appeal.

*Reversed.*

J. G. McCLUER, OKEY JOHNSON, FIELDER C. SLINGLUFF
and J. T. PIGGOTT, for appellants.

V. B. ARCHER, for appellee.

DENT, JUDGE:

The appellee in this case, Elvira B. Archer, was a mem-
ber of the appellant Baltimore Building & Loan Associa-
tion, holding fifty shares of stock, of the par value of five
thousand dollars.   She borrowed on said shares the full
par value thereof, to wit, five thousand dollars, which she
received in cash, and to secure the same executed her
bond and a deed of trust on certain property, enforce-
able on her failure to pay the premiums, interest,
dues, and other charges according to the by-laws of the
association.   Appellee paid into the treasury of the asso-
ciation at various times the sum of four hundred and fifty
dollars, but neglected all further payments as provided in
the by-laws, when, her rights becoming forfeited, the trus-
tee was directed to make sale of the property given in se-
curity.   At this time the association claimed the amount
due to be five thousand four hundred and forty-four dol-
lars and eighty-two cents, while the appellee insisted the
true amount to be five thousand and twenty-five dollars,
and obtained an injunction to restrain the sale until
the true amount of the indebtedness was ascertained and
determined.   After the pleadings were made up, the cir-
cuit court referred the case to a commissioner to ascer-
tain the true amount due.   He reported it to be five
thousand one hundred and sixty-two dollars and eighty-
one cents.   The appellant excepted, but the court over-

ruled the exception, and entered a decree confirming the report, perpetuating the injunction as to the residue of appellant's claim, and decreeing a sale of the property on non-payment of the sum reported. From this an appeal was taken, and many errors assigned, all of which have been more elaborately argued than the real controversy, as disclosed by the record, deserves. The appellee assigns no errors, but merely asks for an affirmance of the decree. To prevail in this Court, the appellant must show error to its prejudice, which is a complete answer to most, if not all, of the assignments presented and argued. The exceptions to the commissioner's report present the only questions necessary for the consideration of this Court, and these are only two in number:

1. Did the commissioner err in not compounding the interest monthly because payable monthly? This is not insisted on in the argument, but the commissioner's report is apparently conceded to be correct in so far as it relates thereto. It is certainly in accordance with the law of this State. While the interest was payable monthly, it could not be compounded on failure of payment. *Genin* v. *Ingersoll*, 11 W. Va., 549; *Craig* v. *McCulloch*, 20 W. Va., 148; *Stansbury's Adm'r* v. *Stansbury*, 24 W. Va., 634; *Reger* v. *O'Neal*, 33 W. Va., 159, (10 S. E. 375).

2. Did the commissioner err in not charging Mrs. Archer premium at the rate of fifty cents per share per month? And this is the sole matter of importance presented for our consideration. The first payment of premium was allowed the association, and for which Mrs. Archer was not given credit on the sum due. All other premium charges were disallowed, not apparently because they were contrary to law, but for the reason that they were not authorized by the by-law of the association in relation thereto. The by-law in relation thereto is as follows, to wit:

"Section 1. The funds of this corporation which belong to the loan fund shall be loaned to the member paying fifty cents per share premium therefor, in addition to the stipulated six per cent, per annum interest, upon such terms and security as the board of directors may from time to time approve."

Admitting the contract of Mrs. Archer to be a Mary-

land contract, because it is to be performed in the city of Baltimore, at the chief office of the association, which appears to be the general trend of modern decisions on the subject, yet the legislature has the right to provide the limitations under which foreign corporations may do business in this State, and by section 30, chapter 54, Code, it has provided that "any corporation duly incorporated by the laws of any state or territory of the United States or of the District of Columbia or of any foreign country, may, unless it be otherwise expressly provided, hold property and transact business in this State upon complying with the requirements of this section and not otherwise. Such corporations so complying shall have the same rights, powers and privileges, and be subject to the same regulations, restrictions and liabilities, that are conferred and imposed by this and the fifty-second and fifty-third chapter of this Code, and by chapter 20 of the acts of 1885 on corporations chartered under the laws of this State." The purpose of the law was to put foreign and domestic corporations on an equality in so far as they each transacted business in this State. To enjoy the privilege of doing business here, every foreign building association must conform to the requirements, and comply with the restrictions, imposed on domestic associations. Section 26 of chapter 54 provides that "every such association shall have the power to provide by its by-laws for selling to the stockholders, who bid the highest premium therefor, the money in the treasury, or in default of bidders at or above a minimum premium, may award to a member the value of any share held by him less such minimum premium; the minimum premium and the mode of making the award to be fixed by the by-laws. * * *" Section 29 provides: "Every such association shall adopt by-laws, which shall embrace all the provisions of the four preceding sections, and such further provisions for its government and the management of its business not inconsistent with these sections, as it may deem proper." Having adopted such by-laws, the association is bound by them, and they become a part of the contract of advancements made to its members, and furnish them with information as to the obligations imposed upon them in becoming bor-

rowers. Nor can they be held to any other or stricter
obligations as to premiums, interest, dues, and other
charges than the by-laws impose. The object of this is
that all members shall be treated alike, and not subjected to
unequal conditions or those of which they are not fully in-
formed before their undertaking. The statute allows the
fixing of a minimum premium, which may be deducted
from the loan in advance, or paid in periodical installments;
and since the adoption of this provision competitive bid-
ding for loans has become almost obsolete, and rightly so,
for it is an unjust, unequal, deceptive, and oftentimes
harsh way of disposing of the funds to the detriment of
those who were most needy. A minimum premium pro-
duces equality, and, being once fixed, borrowing members
are not willing to exceed it in their biddings. It thus be-
comes a question of mere priority of right, and each bor-
rower contributes an equal percentage to the profit or so-
cial funds. The by-law of the appellant fixed the pre-
mium at fifty cents per share. The appellant insists that
it was intended to be fifty cents per share per month, pay-
able monthly, and so it charges up the account against
Mrs. Archer. But from its language it is impossible to
so construe it. It would be easier to construe it as fifty
cents per share per annum, as the words per annum are
used in the same clause, and by liberal use of commas,
and some stretch of the imagination, might be applied to
the premium as well as to the interest. It may be an
omission or oversight, but it is one that cannot be supplied
in any manner other than by the amendment of the by-law,
which would not affect the present controversy. It is
therefore plain that the circuit court could not do other-
wise than reject the premium claimed other than the first
payment. This conclusion, if adopted by the court would
render it unnecessary to consider the constitutional ques-
tion raised It is, however, said in relation to usury, in 4
Am. & Eng. Enc. Law (2d Ed.) 1073, to be "generally held
that an exemption law applying to building associations is
valid, although the constitution of the State prohibits local
or special laws regulating the rate of interest on money,
and declares that special privileges shall not be granted
individuals or corporations. Courts of high respectability

have taken the opposite view, however." The advancements made by building associations to their members differ so materially from ordinary loans that the legislature is justified in classing them separately as regards the interest and usury of such transactions. *McEldowney* v. *Wyatt*, 44 W. Va., 711 (30 S. E. 239). In this case the par value of the share owned by Mrs. Archer was advanced to her in money, she to make monthly payments, including premium, interest, and dues, until the earnings and capital of the association in the class to which she belonged reached the par value of the stock of such class, when the advancements made her and her stock were to offset against each other, and this stock canceled. The capital of the association consisted of the dues paid in, while the earnings consisted of the premiums, interest, fines, and other charges, all of which after the payment of the necessary contingent expenses, formed the social funds of the association, to be applied, when sufficient, in canceling the stock of the membership. The advancements were different from ordinary loans, in that they were not to be paid back, but the members paid in lieu thereof, in monthly installments, premiums, interest, and dues, as required by the by-laws of the association. The monthly installments being considered equivalent to, and not much in excess of, the rental of the property, the money advanced was used in building. Monthly payments, a share in all the earnings of the association proportionate to the amount of the stock held, and the home-building purpose for which the advancement is used are the main distinguishing features from common loans. Such associations, when properly conducted, under judicious restrictions and management, are a helpful blessing and encouragement to a community. But the ambitious extravagance of some borrowing members places themselves in a burdensome condition, from which they are unable to extract themselves, and the sacrifice of their property follows. Far better for the public, the associations, and their membership that many small loans be made rather than a few in number and large in amount. Moderate homes and a moderate price should be the criterion. As a home increases in price, the real rental value thereof decreases in proportion, and the monthly

payment becomes more burdensome. Building associations were not originally intended for the purpose of fostering extravagance, and encouraging the building of expensive dwellings. Their primary purpose was, and should continue to be, to promote industry, frugality, and saving, and convert the shiftless and discouraged into a self-reliant and contented home builder. It is impossible to protect men, and women too, against their own improvidence; yet while the courts have not, the legislature has, the power to limit, by a fixed maximum, the advancements made by associations to their shareholders, so as to effect in a greater degree the evident justification, for their corporate existence. Restrictive limitations will promote the interests of, rather than be an injury to, such associations, as the use of the pruning knife increases the production of the vine. Their being a dispute as to the true amount of her indebtedness, Mrs. Archer had the right to have a court of equity determine it before her property should be put to sale. To obtain equitable relief, it was not necessary for her to tender the amount acknowledged by her to be due. It is the unconscionable demand of more than is justly due that gives equity jurisdiction, and, if this does not exist, equity is without jurisdiction. The by-laws followed in this opinion are those brought up on *certiorari*, as they appear to be the only by-laws furnished to, and acted on by, the circuit court, and the record cannot be amended by the substitution of others, except in some lawful way, and thus present a new and different controversy for the first time in this Court. The by-laws furnished by Mrs. Archer, presumably being those on which the circuit court acted, should govern this controversy. Such by-laws should be free from ambiguity, and obscurity, so as not to mislead or deceive the membership, as they will be construed strictly against the association, and favorable to those deceived thereby. Such being the true status of the case, the judgment should be affirmed. Mrs. Archer, however, in her application proposed to pay a premium of fifty cents per share, payable monthly; which evidently shows she had information of, and acceded to, the construction put upon the by-laws by the association. My associates, therefore,

are of the opinion that she in her written application for a loan, in her deed of trust, and bond executed by her to the association, and by virtue of the by-laws appearing in the original record, bound herself to pay a premium of fifty cents per share monthly, and that such premium so payable is not usurious, under the laws and constitution of this State, nor under the laws and constitution of the state of Maryland, and that she should be held to her contract. In submission to their authority, the decree complained of is reversed, the injunction dissolved, and the bills dismissed for want of equity.

*Reversed.*